FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-01046-MSK-BNB

UFCW LOCAL 880-RETAIL FOOD EMPLOYERS JOINT PENSION FUND, on Behalf of
Itself and All Others Similarly Situated,

       Plaintiff,

v.

NEWMONT MINING CORP.,
WAYNE W. MURDY,
PIERRE LASSONDE, and
BRUCE D. HANSEN,

       Defendants.
_____

**consolidated with**
_____
Case No. 05-cv-01100-MSK-CBS

JOHN S. CHAPMAN, individually and on behalf of all other similarly situated,

       Plaintiffs,

v.

NEWMONT MINING CORP.,
WAYNE W. MURDY,
PIERRE LASSONDE, and
BRUCE D. HANSEN,

       Defendants.
_____

**consolidated with**
_____

1

Case No. 05-cv-01141-MSK-BNB

ZOE MYERSON, Individually and On Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

NEWMONT MINING CORP.,
WAYNE W. MURDY,
PIERRE LASSONDE, and
BRUCE D. HANSEN,

      Defendants.

---

## OPINION AND ORDER IMPOSING SANCTION AGAINST
## JAMES W. ANDERSON, JR. AND STEVEN REIFMAN

---

**THIS MATTER** comes before the Court pursuant to the Response **(# 94)** of Proposed Intervenors Gideon Minerals, U.S.A., Inc., PT Lebong Tandai, PT Tanjung Sera Pung, and PT Pukuafau Indah (collectively, "Gideon"), by and through their attorneys James W. Anderson and Steven W. Reifman, in response to this Court's March 30, 2007 Opinion and Order Denying Motion to Intervene and Directing Counsel to Show Cause Why Sanctions Should Not be Imposed **(# 93)**.

### Procedural Context

Familiarity with the Court's prior Orders is assumed. The Court directed Gideon to show cause with regard to three issues: (i) why it should not be sanctioned pursuant to Fed. R. Civ. P. 11(b)(1) and (2) for filing 9 substantive documents in this case while its request for leave to intervene remained *sub judice*, and thus, its ability to participate in this action remained

2

undecided; (ii) why it should not be sanctioned pursuant to Fed. R. Civ. P. 11(b)(1) for filing

Docket # 76, 79, and 89, all of which appeared to be irrelevant to the matters at issue in this

litigation; and (iii) why it should not be sanctioned pursuant to Fed. R. Civ. P. 11(b)(1) and (2) for

filing Docket #78 and 92, which appeared to be substantively identical to previous filings in the

action.  The Court advised Gideon that sanctions, if imposed for these actions, might be imposed

personally against its counsel.

Gideon filed a timely response **(# 94)** to the Order to Show Cause.  At the outset, it

denied having "engaged in any act designed to harass the opposing parties."  It then noted the

pendency of a Petition for Writ of Mandamus **(# 87)** it had filed with the 10th Circuit Court of

Appeals, speculating that such filing might deprive this Court of further jurisdiction.[1]  Next,

Gideon noted that "this Court's Opinion and Order refers to the intervening parties only as

Gideon," rather than as four distinct entities.  It emphasized that "This is not just a technicality, it

is critical to the investing public."  Turning to the substantive response, Gideon first explained that

it filed the 9 documents without first obtaining permission to intervene because "This Court did

not rule for almost six [ ] months on the motion," and that, "[a]s any dutiful advocate would do,"

Gideon's counsel "consulted the court rules, the Constitution and case law for support and

guidance so as to act zealously for his clients."  It goes on to state that because it was entitled to

intervene as a matter of right because the parties to this action did not object to the Motion to

Intervene, relying on *Exchange Natl. Bank v. Abramson*, 45 F.R.D. 97 (D. Minn. 1968).  This

portion of the response also freely, and incomprehensibly, mixes in certain explanations regarding

Gideon's filing for entry of default under Fed. R. Civ. P. 55.  Gideon goes on to explain that its

---

[1]The Petition was denied by the 10th Circuit on May 15, 2007 **(# 103)**.

multiple filings "are a direct product of a limited electronic system that the Federal Courts have implemented," and that "the rigors and pigeon holing of the system thus necessitat[ed] the re-filings."[2]  Gideon contends that "In our sworn duty as advocates, we were nearly duty bound to respond in some fashion" to attempts by the parties to settle this action.

　　　　Turning to those documents cited by the Court as irrelevant or redundant, Gideon contends that its Second Request for Entry of Default (**# 76**) was filed because the Clerk of the Court failed to perform the "ministerial act" of entering default upon Gideon's first request.  Its Third Request for Entry of Default (**# 78**) was filed in response to a filing (**# 77**) by the Plaintiffs, and was intended to "advise[] the clerk that nothing in Docket # 77 justified refraining from entering the default as a ministerial act."  Gideon explains that "We have found no authority to allow the court to intercede, nor for the clerk to refrain from entry of a Request for Entry of Default," and that its multiple requests for entry of default "were not redundant as the court stated, but were done in response to the situation as it evolved."  With regard to Gideon's filing of a Supplement (**# 92**) that merely restated prior argument, Gideon contends that "such Supplement does not violate any rule, and argues that "The rule of law does not make filings or actions in litigation improper simply because no specific rule allows for same."  Gideon goes on to contend that "the Supplemental Motion included some additional legal authority and made additional arguments in paragraphs 10 and 11."  With regard to its filing of a Notice of the Public Accounting Oversight Board etc. (**# 89**), Gideon explains that it was intended to show that "we would not limit our efforts in achieving unfettered use of our assets in the global capital markets,"

---

　　　　[2]The response blames some of this difficulty on the fact that Gideon was "not technically parties to the proceedings."

and explains that it has been extensively involved in administrative investigations of the

Defendants.  Finally, with regard to the "Request for Judicial Notice" (**# 79**), Gideon explains that

it, too, "was likewise an effort to apprise this Court of the impact of the infractions of Defendant

Newmont."

**Analysis**

As relevant here, Fed. R. Civ. P. 11 requires an attorney to certify that each paper he or

she submits to the Court is not presented for improper purposes and contains claims that are

warranted by existing law or a non-frivolous argument for a change in the law.  Specifically, Fed.

R. Civ. P. 11(b)(1) permits the Court to sanction the signer of any filing that is "presented for

improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost

of litigation."  Fed. R. Civ. P. 11(b)(2) permits sanctions where the document contains legal

contentions that are not "warranted by existing law or by a nonfrivolous argument for the

extension, modification, or reversal of existing law or the establishment of new law."

Rule 11 is intended to prevent abuses arising from bad faith, negligence and, to some

extent, professional incompetence. *White v. General Motors Corp.*, 908 F.2d 675, 680 (10th

Cir.1990). In determining whether an attorney's conduct violates Rule 11, the Court applies an

objective standard, examining whether a reasonable, competent attorney would believe, under the

circumstances, that the particular filing was permissible and warranted.  *White v. General Motors

Corp.*, 908 F.2d 674, 681 (10th Cir. 1990).

1. Warranted by existing law

The Court turns first to whether Gideon has shown that the nine challenged filings assert

claims or seek relief that is either warranted under existing law or justified by a good faith

5

argument under Rule 11(b)(2).   A brief recital of the underlying circumstances will help edify this issue, and the Court will then analyze the offending documents in relevant groups.

The Plaintiffs, shareholders of Defendant Newmont Mining, Inc. ("Newmont"), bring this action sounding in securities fraud, alleging that certain public statements made by Newmont as to the quality and quantity of the output of its Batu Hijau mine in Indonesia were untrue. *See Docket* # 35 at 1-4.  Gideon purports to have a dispute with Newmont as to the ownership of the Batu Hijau mine, and contends that "the Batu Hijau . . . mine[ is] not and never [was] the property nor the subject of the business enterprise of" Newmont. *Docket* # 51 at 2.  Gideon sought to intervene in this matter, alleging that a judgment on the Newmont shareholders' securities fraud claims "would have the impact of impliedly or directly creating [a loss to Gideon] since the underlying Plaintiffs' claims state that the mines in question are owned by [Newmont] when in fact said mines are owned by [Gideon]." *Id.* at 3.  Gideon offered no explanation as to how a judgment in favor of the Plaintiffs on the claims of securities fraud would operate to directly or indirectly affect its claims of title to the mine, and for this reason, this Court promptly denied Gideon's motion. *See Docket* # 55 at 3.

Gideon then filed an Amended Motion to Intervene, purporting to clarify the Court's alleged misunderstanding that Gideon was seeking to litigate title to the mine.  However, Gideon's protestations notwithstanding, it was clear from the Amended Motion that that the gravamen of its claim was indeed a dispute over the ownership of the mine. *See Docket* # 57 at 6 ("this litigation infringes upon [Gideon's] . . . current and active business of selling, pledging, and otherwise transacting business in the global financial markets using its [claim to the output of the mine]. . . [A]ny settlement or other disposition of this class action lawsuit that does not address

6

[ownership of the mine] will continue to mislead this Court, the class action Plaintiffs, and the global financial markets regarding [Newmont's] alleged rights in a [claim of ownership] that in fact, does not exist." Both the Plaintiffs and Defendants in this action filed timely responses (**# 65, 66**) to Gideon's Amended Motion to Intervene, noting that the renewed motion did not cure the defects noted by the Court in its prior order denying intervention.

<u>a. Opposition to proposed settlement and requests for entry of default</u>

Shortly after Gideon filed its Amended Motion to Intervene, the parties to this action advised the Court that they had reached a settlement, and requested that the Court preliminarily approve that settlement.  (**# 66, 67**).  On the same date, Gideon filed its reply (**# 73**) in support of its Amended Motion to Intervene, rendering that motion fully briefed and ready for disposition. At the same time it filed its reply, Gideon commenced the course of action giving rise to the instant issue of sanctions.  In particular, over the next three weeks, despite not having secured permission to participate in this action, Gideon filed the following documents:

> • A response (**# 74**) in opposition to the parties' request for preliminary approval of their settlement, alleging that the proposed settlement did not resolve Gideon's claims.  This document was signed by both Mr. Anderson and Mr. Reifman as counsel for Gideon.

> • A Motion for Entry of Default (**# 75**) against the Defendants. This document is signed by both Mr. Anderson and Mr. Reifman.

> • A Second Motion for Entry of Default (**# 76**), signed by both Mr. Anderson and Mr. Reifman.  In addition to again requesting entry of default against the Defendant, this motion complained that the Clerk of the Court had, without authority, referred Gideon's first Motion for Entry of Default to this Court for consideration.

> • A Third Motion for Entry of Default (**# 78**), signed by both Mr. Anderson and Mr. Reifman, which was largely devoted to responding to a filing by the Defendants (**# 77**) objecting to Gideon's first two motions seeking default.

7

This Court finds that, under Rule 11(b)(2), all four of these documents were not warranted by existing law or a good faith argument in support. All four of these documents – and indeed, all of the documents at issue in this Order – were filed by Gideon after its Motion to Intervene had been denied by the Court and while its Amended Motion to Intervene was pending. Gideon appears to assume that, simply by filing a motion seeking to intervene as of right under Rule 24(a), one automatically gains the ability to participate in the action as a party, yet it offers no authority supporting this conclusion. The one case that Gideon has cited for this proposition, *Exchange Natl. Bank v. Abramson*, 45 F.R.D. 97 (D. Minn. 1968), simply does not stand for that proposition. In that case, the plaintiff failed to respond to a putative intervenor's motion seeking leave to intervene, and, there being no opposition, the court granted intervention. *Id.* at 101. When the intervenor later amended the complaint in intervention to strengthen its claim against the plaintiff, the plaintiff objected, arguing that intervention should never have been permitted in the first place. *Id.* The court held that the plaintiff's silence in the face of the initial motion to intervene prevented it from contesting the propriety of intervention at a later time. *Id.* at 102.

*Abramson* has no similarity, either factually or legally, to the issues in this case. First, unlike *Abramson* and perhaps most disturbingly, Gideon baldly misstates the record as to whether the parties to this case objected to its Amended Motion to Intervene. Although Gideon repeatedly insists that the parties to this action did not object to its Amended Motion to Intervene, the docket clearly indicates that both the Plaintiffs and the Defendants filed timely oppositions to Gideon's motion. *See Docket* # 65, 68. Because the parties here opposed intervention, *Abramson* has no persuasive value whatsoever. Moreover, even assuming that Gideon was correct in its assertion that no opposition to its motion to intervene was raised, *Abramson* does

not stand for the proposition that a request to intervene automatically permits the putative

intervenor to thereafter participate as a party.  Gideon has cited no authority whatsoever for that

proposition, and indeed, that proposition appears to be at odds with the common understanding of

Rule 24.  *See e.g. Warheit v. Osten*, 57 F.R.D. 629, 630 (E.D. Mich. 1973) ("intervention is never

automatic, and certain minimal criteria must always be met by the would-be intervenor").  Indeed,

to suggest that one is deemed to become a party simply because one has filed a motion <u>claiming</u>

to meet the criteria of Rule 24(a) would be to abrogate the role of the Court in evaluating motions

to intervene.  This case presents a prime example – although Gideon may have believed it

possessed all of the attributes necessary to entitle it to intervene under Rule 24(a), this Court

disagreed, and intervention was denied.  Gideon's conception of intervention would remove the

Court from this process entirely.  Gideon has neither pointed to existing law that supports this

conception of intervention, nor has it offered a good faith argument that the rules governing

intervention can be interpreted to operate this way.

Moreover, even assuming that Gideon's pending request to intervene entitled it to

participate in this lawsuit, its repetitive filing of requests seeking entry of default would

nevertheless violate Rule 11(b)(2).  Until such time as the Court granted Gideon's motion to

intervene and directed the filing of a Complaint in Intervention, the Defendants were under no

obligation to respond to Gideon's <u>proposed</u> complaint.

Gideon proffers no authority nor articulation of a good faith argument for the general

proposition that a party is required to answer the complaint of a putative intervenor until the

Court has granted intervention.  As to Gideon's second and subsequent requests for entry of

default violated Rule 11(b)(2), Gideon proffers no explanation as to why it had a good faith legal

basis to file repetitive motions seeking the same relief that remained *sub judice* as a result of its first request for entry of default.  Gideon contends that its second and subsequent requests were an attempt to get the Clerk of the Court to enter default, rather than permitting the Clerk to defer to chambers the question of whether entry of default should occur, but offers no authority or good faith argument that the Clerk of the Court was not entitled to do so.  Although Rule 55(a) states that the Clerk "shall" enter default when certain conditions are met, nothing in that rule prevents the Clerk from consulting with chambers if questions arise whether the predicates of Rule 55(a) are met.  Indeed, "the clerk's function is not perfunctory[; b]efore entering a default, the clerk must examine the affidavits filed and find that they meet the requirements of Rule 55(a)." *Wright & Miller*, <u>Federal Practice and Procedure</u> (Civil 3d), § 2682.  Here, Gideon's unique interpretation of its ability to seek default on a complaint in intervention that had yet to be approved is precisely the kind of situation in which the Clerk of the Court would reasonably seek clarification from chambers as to whether default should enter.  Thus, Gideon has failed to offer a legitimate argument as to why its second and subsequent requests for entry of default were proper as well.

Accordingly, the Court finds that all of the documents in this group violated Rule 11(b)(2).

<u>b. Filings concerning accusations in other *fora*</u>

Approximately one month after moving to intervene, Gideon filed a document entitled "Request for Judicial Notice" (**# 79**).  The document requested that the Court "take Judicial Notice that [Gideon] will be filing a new action with the Securities and Exchange Commission to reflect the current legal and factual reality in this Federal District Court case, and will be filing

notice of same with 11 other nations . . . ."  The document explains that Gideon "must make every effort to encourage the Defendants to cease their fraudulent activities in violation of the securities laws of the United States of America, and these 11 other countries."  At approximately the same time, Gideon filed a Notice and Request to Direct the Clerk to Enter Default **(# 81)** against the Defendants.  This document iterates that the Clerk of the Court should have promptly entered default against the Defendants, and goes on to state that "the Court should note that at this writing we are registering [Newmont's] defaults with officials of the Central Bank of the EU through our financial advisors who are former officials of the International Monetary Fund, the World Bank and various other Global Financial officials in France and Asia."  It explains that "the purpose of this notice is to further inform the court of [Gideon's] use of their financial assets in the acquisition and development of mines, and the implementation of a disgorgement plan that will be marginally disruptive to the financial markets."

Gideon has not shown that the filing of these documents was justified by existing law.  At best, these filings request that the Court take judicial notice of  certain facts under Fed. R. Evid. 201.[3]  However, these documents are little more than glorified press releases, trumpeting Gideon's efforts to attack the Defendants in other *fora*.  Gideon offers no explanation as to how the fact that it was filing an action with the Securities and Exchange Commission or complaints with foreign officials was relevant to any issue in this case, much less the proper subject for judicial notice under Rule 201.  Gideon's response to the Order to Show Cause on this issue is a feeble assertion that the Request for Judicial Notice was "an effort to apprise this Court of the

---

[3]To the extent that Docket # 81 was arguably a request for entry of default, it is also sanctionable under Rule 11(b)(2) for the reasons stated above with regard to Gideon's requests for entry of default.

impact of the infractions of Defendant Newmont," without any explanation as to why that information was relevant and properly the subject of judicial notice.  Accordingly, the Court finds that these two documents are sanctionable under Rule 11(b)(2).

c. Filings concerning Magistrate Judge's rulings

In early March 2007, the Court referred Gideon's first three still-pending requests for entry of default to the Magistrate Judge for disposition pursuant to 28 U.S.C. § 636(b)(1)(a) , and the Magistrate Judge promptly denied them **(# 83)**, finding that all three motions were "frivolous," and discussing the propositions set forth above. Gideon immediately filed a Motion for Relief **(# 84)** from the Magistrate Judge's ruling, arguing that pursuant to 28 U.S.C. § 636(c), Gideon had not consented to the Magistrate Judge determining the issue; acknowledged that "we agree" with the Magistrate Judge's statement that the Court, in addition to the Clerk, has the authority to rule on entries of default, but states that Gideon "filed no Motion to place these Requests for Default before a judicial officer"; and argues that "a Motion for Intervention which includes an attached Complaint for Intervention requires a party to respond to both the Motion and the Complaint for Intervention," again citing *Exchange Natl. Bank v. Abramson*, 45 F.R.D. 97 (D. Minn. 1968) for that proposition.[4]  Two days later, Gideon filed a Supplement **(# 86)** to its Motion for Relief from the Magistrate Judge's Order.  This Supplement duplicates the entire contents of the prior motion, and adds two additional paragraphs, one arguing that "Not one single citation in the Order of the Magistrate supports any of the legal conclusions arrived at in the Order," and the second paragraph makes a cumbersome argument that attempts to differentiate between Gideon's

---

[4]Gideon supplies a block quote from *Abramson* that makes no reference whatsoever to the proposition it asserts.

12

"requests" for entry of default directed at the Clerk of the Court and "motions" that warrant judicial intervention, but states that, even if construed as motions for entry of default, the Defendants never responded to them.[5]

On its face, Gideon's responses to the Magistrate Judge's ruling might be construed as a proper objection under Fed. R. Civ. P. 72, and in that respect, would not be sanctionable. However, the Court finds that the contents of those documents themselves are so bereft of reasonable support in law as to be sanctionable nevertheless.  Gideon asserts that its consent was necessary under 28 U.S.C. § 636(c) to permit the Magistrate Judge to determine the matter, ignoring the fact that the reference was made pursuant to 28 U.S.C. § 636(b)(1)(A), which does not require consent.  Gideon's arguments with regard to the ability of the Court to adjudicate requests for entry of default are misplaced as well.  Gideon acknowledges that the Magistrate Judge was correct in finding that "the fact that Rule 55(a) gives the clerk authority to enter a default is not a limitation on the power of the court to do so," *Wright & Miller*, *supra* at § 2682, but argues that it never requested that the Court, rather than the Clerk, do so.  However, Gideon cites no authority and offers no argument as to whether the ability of the Court to consider Rule 55(a) requests is dependent upon the form by which the party making the request frames it.  As the quote from Wright & Miller explains, the rule does not limit the ability of the Court to consider a request for entry of default, and there is no reason to assume that a party's framing of the request can somehow have an effect that the rule itself does not have.

Accordingly, the Court finds that the absence of any reasoned argument by Gideon to the contents of its objections to the Magistrate Judge's ruling is sanctionable under Rule 11(b)(2).

---

[5]This final assertion is patently false.  *See Docket* # 77.

13

### d. Notice of Public Accounting Oversight Board

On March 8, 2007, Gideon filed a document entitled "Notice of the Public Accounting Oversight Board [. . .] Fraud Inquiry of Defendant Newmont" (**# 89**).  This document requested that the Court "take judicial notice" that the U.S. Securities and Exchange Commission was engaging in some sort of "fraud inquiry" of the Defendants.  The document purported to attach an "Auditor's statement of communication in regard to this investigation," but in fact, attached a copy of a letter from a Certified Public Accountant for Gideon to the Assistant Director of Enforcement of the Public Company Accounting Oversight Board, purporting to submit "real-time examples" of Newmont engaging in securities fraud.

For the same reasons stated above with regard to Gideon's requests for judicial notice regarding actions in other fora, this document is also sanctionable under Rule 11(b)(2).

### 2. Improper purpose

The Court also considers whether Gideon interposed these documents for an improper purpose under Rule 11(b)(1).  The Court finds that all of the documents are sanctionable as having been imposed solely for the purpose of harassment and vexation.  This improper purpose is best exemplified by Gideon's various requests for judicial notice.  These documents are clearly not germane to this litigation.  Rather, it is clear that Gideon's purpose in filing these documents was to attempt to intimidate the Defendants by threatening to invoke numerous proceedings around the world against them, and to heighten the notoriety of Gideon and its claims.

The Court finds that Gideon's only purpose in seeking to intervene in this action, and its subsequent filing of the 9 documents at issue here, was for the purpose of hijacking this action to address issues that Gideon wanted addressed, notwithstanding the fact that those issues had no

14

legal significance in the context of this case and had only the thinnest factual connection to the

Plaintiffs' claims.  The Court's denial of Gideon's first attempt to intervene put Gideon on notice

that its theory warranting intervention was flawed.  Rather than reconsider whether this was

indeed an appropriate action to attempt to raise its own claims in, Gideon proceeded bullishly, not

only filing a renewed motion to intervene that did not materially alter its already-rejected theory,

but proceeding to aggressively file numerous frivolous documents, all for the purpose of usurping

the focus of the litigation from the parties' issues to Gideon's.  Whether the Court deems this

conduct to be for purposes of harassment, vexation, or some other label is irrelevant; it was

clearly improper under Rule 11(b)(1), and sanctions are appropriate on this ground as well.

<u>Amount of sanction</u>

A sanction imposed under Rule 11 is intended to serve several purposes: deterring future

litigation abuse, punishing present litigation abuse, compensating victims of litigation abuse, and

streamlining the court's docket and facilitating case management.  *White*, 908 F.2d at 683.

Deterrence is the primary purpose, however.  *Id.*  The Court should select the least severe

sanction necessary to achieve the appropriate deterrence and punishment effects.  *Id.* at 684.

*White* lists several factors that the Court must consider in fixing an appropriate sanction: (i) the

lodestar amount of the opponents' fees, (ii) the minimum necessary to achieve deterrence, (iii) the

sanctioned party's ability to pay, and (iv) other factors, such as the offending party's history,

experience, ability, the severity of the violation, the risk of chilling effects on zealous advocacy,

and so on.  *Id.* at 684-85.

Turning to the first issue, the lodestar calculation, the Court finds this factor irrelevant in

this case.  Although Rule 11 sanctions typically reflect the attorney's fees incurred by the

sanctioned party's opponent, it is appropriate to consider the reasonableness of those fees. However, here, the sanction is imposed at the imposition of the Court, not at the request of any party, and no party has sought to put forward the amount of fees it has incurred as a result of Gideon's counsel's conduct.  The Court notes that, in general, the parties to this action have admirably refused to be goaded into responding at length to Gideon's frivolous filings, and thus, have likely incurred only minimal attorney's fees as a result.

The second factor is the minimum amount necessary to achieve deterrence.  As *White* points out, Rule 11 sanctions should not be used as a tool to financially drive incompetent or unethical counsel out of practice; that is the role of disciplinary committees. *Id.* at 684.  Rather, the Court must attempt to limit the sanction to the amount necessary to deter counsel from future conduct of a similar nature.  *Id.* at 685.  With regard to this factor, the Court makes several observations.  First, the Court notes that this was not isolated or sporadic conduct by Gideon's counsel.  Rather than being dissuaded by the Court's initial denial of its request to intervene, Gideon continued to press the same defective theory.  It did the same with its multiple motions seeking entry of default, and its multiple filings of inflammatory material under the auspices of seeking "judicial notice."  The pattern has not yet abated.  Notwithstanding the looming threat of sanctions from this Court's Order to Show Cause, Gideon has continued to file papers despite it having been twice denied leave to intervene and it having no current right to participate in this litigation. *See e.g. Docket* # 100 (Gideon's Motion to Stay); 117 (Gideon's "Notice of Congressional Inquiry").[6]  Any sanction must therefore be significant enough to effectively stop

---

[6]Indeed, some of these papers are as frivolous and sanctionable as those addressed by the Court, although the Court confines its sanctions analysis to only those filings encompassed by its Order to Show Cause.

Gideon's persistent and frivolous attempt to hijack this litigation for its own purposes.

As to the third *White* factor, Gideon's counsel's ability to pay, the record is bare. The Court's Order to Show Cause specifically advised counsel that the Court was entertaining the imposition of monetary sanctions directly against them,[7] and yet, their response raises no issue as to their ability to pay a monetary sanction. The court in *White* made clear that inability to pay is in the nature of an affirmative defense, and it is the burden of the sanctioned party to put forward evidence demonstrating such inability. 908 F.2d at 685. Because Gideon's counsel has not come forward with evidence as to their inability to pay, this factor carries no weight in the fixing of the amount of the sanction.

Finally, *White* requires the Court to consider a variety of miscellaneous factors. The record does not reflect Gideon's counsel's level of experience or history of practice in this District, but that factor has little bearing on the issue. Whether Gideon's counsel are wizened litigators or freshly-minted attorneys is largely irrelevant, as all counsel admitted to this District are expected to demonstrate adequate competence. In the absence of evidence on this factor, the Court will assume Gideon's counsel to be moderately experienced, but ultimately, all counsel admitted to practice in this District are expected the demonstrate at least minimal competency, and regardless of their level of experience, Gideon's counsel's performance fell well below this threshold. The Court must also consider the severity of the violation and the extent of bad faith by counsel. The Court finds the sheer number of frivolous filings indicates that Gideon's counsel's conduct was of more than minimal severity, and indeed had the purpose and effect of

---

[7]Given that the offending conduct involves the taking of frivolous legal positions, and insofar as the Court's Order to Show Cause only invoked Rule 11, the Court considers sanctions are appropriate against Gideon's counsel, not Gideon itself.

disrupting and somewhat prolonging litigation that was otherwise nearing its end.

The Court also considers whether the sanction will have a chilling effect on zealous advocacy. Gideon has raised this issue in its response to the Order to Show Cause, but beyond stating that a sanction should not operate to chill zealous advocacy, does not explain how that factor bears on the imposition of a sanction in this case. "Zealous" advocacy means competent and prepared advocacy - not simply aggressiveness without regard to propriety. The Court finds little reason to be concerned about any chilling effects on zealousness here, as Gideon's counsel's actions reflected neither competence nor adequate preparation. Gideon's counsel's concern for their client's interest may be laudable, but such concern does not justify the repetitive filing of frivolous documents in this action where no colorable injury to Gideon was cognizable.

Having considered all of the relevant factors in light of the particular circumstances herein, the Court finds that an appropriate punishment is to sanction Gideon's counsel the sum of $500 per offending document, payable jointly and severally. The Court reaches the $500 sum by considering the value of the time required of various court personnel to deal with each of the offending documents. At a minimum, each document required review and assessment (and, often, correction) of the docketing of the document by the Court's docketing staff; consideration of the merits of the document by the Court itself; the preparation of the Order to Show Cause, explaining the Court's initial concerns as to the sanctionable content of each document; review of Gideon's response; preparation of this Order extensively analyzing each filing; and the time spent by the Court's docketing staff to enter orders striking or otherwise resolving each filing. All told, the burden on the Court from these findings certainly amounts to several hours per document. At prevailing rates in private law firms, the professional time component alone would exceed $500 in

18

value, and even acknowledging the reduced value of government salaries, the Court is confident that $500 per document reflects <u>less</u> than the actual financial burden these filings imposed on the Court.[8]  Moreover, the Court finds that $500 per document strikes an adequate balance between deterrence and punishment on the one hand, and avoiding onerous financial burdens on the other. This sanction would appear unlikely to cause significant hardship to attorneys representing a client claiming ownership of billions of dollars in gold reserves, but is a significant enough punishment to compel Gideon's counsel to exercise greater care and competence in future cases.

Accordingly, the Court, *sua sponte*, imposes sanctions pursuant to Fed. R. Civ. P. 11(b)(1) and (2) against James W. Anderson, Jr. and Steven Reifman, counsel to Gideon in this matter, jointly and severally, in the amount of $500 per document with regard to Docket # 74, 75, 76, 78, 79, 81, 84, 89, and 92, for a total sanction of $ 4,500.  Counsel shall pay this sanction to the Clerk of the Court within 15 days of the date of this Order.  Failure to remit the sanction may

---

[8]Because the Court imposes sanctions *sua sponte*, it has not considered the additional cost that Gideon's filings visited upon the parties in the form of attorney's fees in reviewing and, where appropriate, responding to Gideon's various filings.  However, the Court has no doubt that $500 per document reflects substantially less than what either party incurred in reasonable attorney's fees with regard to these documents.

result in the imposition of additional sanctions, including but not limited to contempt sanctions.

Given that Gideon has no standing to appear in this action, the Clerk of the Court shall terminate all pending motions filed by Gideon and shall strike all of Gideon's filings after Docket # 94.

Dated this 25th day of September, 2007

BY THE COURT:

Marcia S. Krieger
United States District Judge